**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00668-REB-MJW

**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,**

                **Plaintiff,**

v.

**ST. ANSELM EXPLORATION CO.,
MICHAEL A. ZAKROFF,
MARK S. PALMER,
ANNA M.R. WELLS, and
STEVEN S. ETKIND,**

                **Defendants.**
_____

**PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF ACCOUNTING
EXPERT STEVEN J. SHUSTER, PURSUANT TO FED. R. EVID. 702 AND
ACCOMPANYING MEMORANDUM OF LAW**
_____

Plaintiff, United States Securities and Exchange Commission, respectfully moves this Court for an Order excluding the testimony of Steven J. Shuster, an accounting expert for the defendants St. Anselm Exploration Co., Michael A. Zakroff, Mark S. Palmer, and Anna M.R. Wells (the "St. Anselm defendants"), pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Mr. Shuster's opinions are not relevant, are not supported by sufficient facts and data, and are not based on reliable methodology or methodology that is consistent with sound accounting practices. The SEC submits the following memorandum of fact and law in support of this motion.

Memorandum of Law and Argument

I.   Background

The SEC claims that the St. Anselm defendants engaged in a scheme to defraud investors and alleges the following facts relevant to this motion. St. Anselm received more than $49 million in cash proceeds from the sale of promissory notes between the 45-month period beginning on January 1, 2007 and ending on September 30, 2010. Compl. at ¶¶ 1, 27. All, or almost all, of the promissory notes had maturities of 90 days, one year, or at most, three years, and annual interest rates ranging from 18% to 36%. *Id.* at ¶ 28.

St. Anselm did not have sufficient revenues to meet its debt service obligations to promissory note holders. *Id.* at ¶¶ 35, 37. Nevertheless, St. Anselm continued to distribute funds to the St. Anselm defendants, distributing a net total of more than $16 million to Palmer and Wells during the 45-month period that is the subject of the complaint. *Id.* at ¶ 41. To raise the funds to pay the interest and principal due on existing notes, St. Anselm sold new high-interest promissory notes or enticed existing investors to "reinvest" by rolling over expiring notes. *Id.* at ¶¶ 37-39, 42. By October 1, 2009, St. Anselm's controller had notified the defendants that the company needed to raise about $2 million per month from new promissory note holders just to "pay interest, pay the non-renewals, and pay for G&A [general and administrative expenses]." *Id.* at ¶ 49.c.

The SEC engaged Kristina A. Cook, CPA, a financial/forensic consultant employed by Patten, MacPhee & Associates, Inc., to perform a forensic analysis

of St. Anselm's sources and uses of cash during the 45-month period.[1]  Ex. 4 at p. 2.[2]  Typically, forensic accounting professionals use a methodology of gathering, reviewing, and analyzing data to perform a forensic analysis.  *Id.*  Ms. Cook's forensic methodology in this case involved analyzing St. Anselm's historical bank records during the period from January 1, 2007, through September 30, 2010 to determine whether later investor funds were used to pay earlier investors and whether note proceeds were used to fund payments to defendants Wells and Palmer.  *Id.* at p. 3.

Ms. Cook stated in her report that she was able to account for every deposit to and withdrawal from St. Anselm's main bank account.  *Id.* at p. 5.  In addition, by scheduling the transactions that flowed through St. Anselm's main bank account, Ms. Cook has stated that she was also able to account for all of the cash funds at St. Anselm, including funds flowing through the payroll cash account, petty cash account, and a stock account.  Ex. 5 at ¶¶ 3-8.  The Cook affirmative and rebuttal reports and the detailed schedules attached to those reports establish the accuracy of Ms. Cook's statements.  *See id.* at ¶¶  3-8 & 14; *see generally*  ex's 1 & 4.

---

[1]  Ms. Cook was awarded a Bachelor of Science in Accounting, summa cum laude, in 1998, is a certified public accountant and a certified fraud examiner, and is certified in financial forensics.

[2]  The exhibits filed in support of the SEC's motion and accompanying memorandum of law are:
  Exhibit 1- Kristina Cook's affirmative report dated January 17, 2012
  Exhibit 2- Steven Shuster's rebuttal report dated March 1, 2012
  Exhibit 3- Excerpts from Steven Shuster's March 23, 2012 deposition testimony
  Exhibit 4- Kristina Cook's rebuttal report dated  March 15, 2012
  Exhibit 5- Sworn Declaration of Kristina Cook dated March 30, 2012
  Exhibit 6- March 21, 2012 Letter of Steven Shuster correcting expert report

The St. Anselm defendants produced a rebuttal report prepared by Steven Shuster, CPA, of Shuster & Company, PC of Denver, Colorado. The SEC deposed Mr. Shuster about his report on March 23, 2012.

II.     Relevant Law

Rule 702 of the Federal Rules of Evidence allows an expert witness to testify in the form of opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court is the gatekeeper for the admission of expert testimony. The court's central objective is to ensure that the expert employs the same level of intellectual rigor in the courtroom that characterizes the practice of an expert in the relevant field. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 593-94 (1993); *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 141-42 (1999); *Graves v. Mazda Motor Corporation*, 405 Fed. Appx. 296 (10th Cir. 2010).

> A.     <u>Mr. Shuster's opinions that Ms. Cook's cash flow schedules "should be challenged" and "may not be comprehensive" are not based on sufficient facts and data, are not the product of a reliable methodology, and do not employ the rigor expected of an expert in the field.</u>

Mr. Shuster opined in his report about the accuracy of Ms. Cook's cash flow analyses:

> (1)    It is Shuster's opinion that the Cook Report's Schedules 1 and 2 (¶39 and ¶40) *should be challenged* for their inclusiveness and accuracy of all sources and uses of funds. Ex. 2 at p. 4 (italics added).

(2) As a result of the significant variance between the amounts of 'sources of funds' and 'uses of funds' as presented in the Cook Report and the amounts presented as debits and credits in the St. Anselm general ledger; it is Shuster's opinion that Ms. Cook's analysis *may not be comprehensive*. *Id.* (italics added).[3]

Mr. Shuster did not base his opinions on sufficient data, his opinions are not the product of reliable principles and methods, and he did not employ the rigor expected of a forensic accounting professional in preparing his summaries of the sources and uses of cash.

Mr. Shuster prepared his own analysis of sources and uses of cash at St. Anselm by (1) downloading the St. Anselm general ledger for a six year period to an Excel spreadsheet, (2) totaling the debits and credits in the general cash accounts for each year, and (3) using the resulting debit and credit totals as the annual total sources (debits) and uses (credits) of cash at St. Anselm. He then compared his schedules to Ms. Cook's schedules. Because there was a "substantial variance" between the amounts of "sources of funds" and "uses of funds" presented in the Cook Report and the amounts presented as debits and credits in the St. Anselm general ledger, he concluded that Ms. Cook's analysis "may not be comprehensive."

The general ledger summarizes the company's internal record keeping, including journal entries and monthly totals from its subsidiary accounts that make up the company's books and records. Ex. 4 at p. 5. As Ms. Cook notes in her rebuttal report dated March 15, 2011,

---

[3] Mr. Shuster acknowledged at his deposition that his report had incorrectly stated that Ms. Cook was unable to account for all deposits and withdrawals. *See* Ex. 2, attachment A, at p. 3. In fact, Ms. Cook reported that she was able to account for all deposits and withdrawals.

> This internal recording [in the general ledger] may or may not be accurate. Most companies periodically reconcile the cash account in the general ledger to the bank statements in order to determine if the transactions in the cash account in the general ledger match what is shown on the bank statement. If they do not, generally additional research is necessary to identify the missing items and/or transactions and corrections are made. However, unless this reconciliation is done, it is unknown whether the general ledger reflects actual activity in the bank account.
>
> In this case, Mr. Shuster has not shown that the general ledger reconciles to the bank account. Furthermore, I observed in my analysis that the adjusting journal entries prepared by the Company's accounting firm to correct the books were not reflected in the general ledger. Therefore, it is my opinion that the general ledger is not complete and should not be relied upon to analyze cash activity in the bank account. It is further my opinion that the bank statements are the most reliable source of information for an analysis of cash activity in the bank account. Ex. 4 at pp 5-6.

Mr. Shuster ignored the fact that his basis for comparing his analysis of the general ledger to Ms. Cook's detailed list of the deposits and checks that flowed through St. Anselm's bank accounts was similar to making a comparison of apples to celery – both products are food, but the similarities end quickly. In this case, the only similarity between the Cook and Shuster methodologies is that Cook and Shuster both looked at business records related to St. Anselm.

As explained earlier, Ms. Cook prepared a forensic analysis of all of St. Anselm's cash transactions by looking at every deposit to and withdrawal from St. Anselm's main bank account. Ex. 4 at p. 5. By scheduling each incoming and outgoing transaction, Ms. Cook was able to account for every cash transaction at St. Anselm, including cash flowing through the payroll cash account, a sweep account, and petty cash. Ex. 5 at ¶¶ 3-8 & 14; *see generally* Ex. 1; Ex. 4.

Shuster's method, in contrast, was a useless exercise because it took a single accounting record that contained thousands of individual entries but failed to look at the entries that made up the accounting record. For example, Mr. Shuster's methodology did not take into account the many different types of adjusting journal entries that are entered into a company's general ledger. He did not analyze the general ledger to remove debits and credits of the same amount that would have been "self-balancing." Ex. 3 at p. 91-94. Such entries, if not identified and removed from the calculations, would artificially inflate both the sources and uses of cash using Shuster's methodology.

Not only are the Shuster schedules not comparable to Ms. Cook's schedules, they are inherently inaccurate due to Mr. Shuster's failure to employ sound accounting practices. *See* Ex. 2, attached ex A. at p. 3 (presenting Shuster's "finding" that the "Total Source of Funds was $128.2 million"). Shuster did not compare his results to bank reconciliations to ensure that the general ledger balance in the cash account balanced to the cash in bank balance shown St. Anselm's bank statements. Ex. 3 at p. 87. As Ms. Cook stated in her rebuttal report, without a bank reconciliation, Mr. Shuster could not have determined whether the general ledger balance, after adding all of the debits and credits to the cash accounts, was a true reflection of the cash flowing through St. Anselm's bank accounts.

[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009). *See also Dhillon v. Crown Controls Corp.*, 269 F.3d 865,

870 (7th Cir. 2001) (finding that an expert's conclusions based on his personal opinion and experience were properly excluded when he could have substantiated and tested his alternate design theory). In this case, a forensic analysis of the general ledger would have required Mr. Shuster to go beyond gathering data from the general ledger, to testing the data for accuracy and completeness, and validating the data through alternate techniques. See ex. 2 at p. 2. Mr. Shuster did not undertake such an analysis. S*ee* Ex. 3 at p. 154. Indeed he testified that "it clearly was not my intention to give any kind of professional opinion as to the accuracy of the general ledger." *Id.*

Mr. Shuster agreed during his deposition that he did not know whether St. Anselm's general ledger was accurate. *Id.* He testified that he did not review the credits in the general ledger for accuracy and completeness, ex. 3 at p. 87-89; did not look at documentation supporting journal entries and only "sometimes" looked at the journal entries themselves, *id.* at p. 153; and could not recollect whether he had traced St. Anselm's journal entries to the cash account. *Id.* at p. 142-43.

The results of Mr. Shuster's analysis demonstrate the effect of failing to validate accounting calculations by using alternate techniques. The analysis of the "uses of funds" set out in exhibit B.2 of the Shuster report "balanced" only because the source for line 51, "other income" was a calculated number, or a "plug." In the case of the Shuster report, the "plug" to "other income" had a mathematical error.

A reliable methodology would have revealed the error in Mr. Shuster's schedules. For example, if Mr. Shuster had taken St. Anselm's reconciled cash balance at the beginning of the period, added the total sources of funds on his Schedule B.1, and subtracted the total uses of funds on his Schedule B.2, the resulting amount should have been the same as the reconciled cash balance at the end of the period. A different result would have meant that there was an error in the analysis.

Doing that foregoing calculation with the numbers in Shuster's schedules indicates that St. Anselm's bank account would had to have been overdrawn by millions of dollars at the end of period, an unlikely event. *See* Ex. 4 at pp. 10-11 (noting that the use of funds on Shuster exhibit B.2 of $148,168, 986 exceeded the sources of funds shown on Shuster exhibit B.1 of $128,227,246 by nearly $20 million). After Ms. Cook pointed out this error in her rebuttal report, Mr. Shuster made a correction and acknowledged that the correction reduced his calculation of St. Anselm's total uses of cash by $20 million. Ex. 3 at p. 170.

To be reliable and relevant, expert testimony must assist the trier of facts. In this case, Mr. Shuster's opinions that Ms. Cook's work <u>might</u> be inaccurate would not assist the triers of fact. He was unable to opine that Ms. Cook's cash flow schedules <u>were</u> inaccurate. Ex. 3 at p. 87-88 (opining that Cook's cash schedules should be looked at "with a jaundiced eye"); Ex. 2 at p. 6 (opining that Cook's schedules "may not be comprehensive"). The only fact that he has stated with any degree of certainty was that he "definitely didn't know" whether Ms.

Cook's cash flow analyses had in fact captured all of the cash transactions at St. Anselm during the 45-month period at issue in her report. Ex. 3. at 87-89.

  B. <u>Mr. Shuster's gratuitous opinions about the scope of Ms. Cook's engagement are not relevant, are not rebuttal opinions, are not based on sufficient facts and data, are not within his area of expertise, and are not based on reliable methodology</u>.

Mr. Shuster provided several gratuitous opinions about the scope of Ms. Cook's engagement by the SEC that are not responsive to an issue raised in her reports, are not supported by sufficient facts and data, are not based on any methodology, and are not within his area of expertise. The following opinions will not be of assistance to the triers of fact.

> (1) It is Shuster's opinion that an understanding of the time interval necessary to explore, acquire, develop and sell geothermal energy projects as well as oil and gas projects should be considered to evaluate whether the 3.75 years of bank statements analyzed by Ms. Cook are representative of the expected project cycle for these activities. Ex. 2 at p. 3.

> (2) It is Shuster's opinion that the exclusion of . . . information [about the changes in the market value of various investments held by St. Anselm] is a limiting factor to [the Cook] schedules utility as a means to evaluate the ability of St. Anselm to ultimately satisfy its obligations to notes payable. *Id.*

> (3) It is Shuster's opinion that [Cook's finding that $11.2 million or more of proceeds from the issuance of promissory notes were used to make interest and principal payments to holders of promissory notes during the 45-month period] . . . is a finding consistent with traditional business practices employed by many private or public companies in the United States whereby short-term debts are refinanced to improve or restore liquidity allowing those companies to continue operations. . . . We would expect that the refinancing of St. Anselm's obligations would necessarily entail cash flows from new notes payable and would provide a source of funds to extinguish maturing obligations. *Id.* at p. 5.

>   (4)     It is our opinion that it is reasonable for a business to distribute a portion of the proceeds from the sale of assets and ownership interests to the business equity owners.  *Id.*
>
>   (5)     It is Shuster's opinion that a user of Ms. Cook's conclusions should be mindful of the recession experienced by the United States during the last several years.  *Id.*
>
>   (6)     It is our opinion that it is reasonable for a business to distribute a portion of the proceeds from the sale of assets and ownership interests to the business equity owners*.  Id.*
>
>   (7)     It is Shuster's opinion that since the Company maintains its books and records on the Income Tax Basis of accounting [,] it is necessary to consider the fair market value of the oil & gas, geothermal and other partnership interests which St. Anselm lists as assets to determine the ability of the Company to pay its obligations.  *Id.* at p. 6.
>
>   (8)     The length of the cycle from exploration to development to sale may have a significant impact on the timing of cash flows received by St. Anselm.  Ex. 2, attached ex. A, p. 1.
>
>   (9)     [T]he company and its lenders should not have expected the 'revenues from oil and gas alone to be sufficient to service debt.' Id. at p.4.

Not a single opinion listed above is responsive to an opinion in Ms. Cook's report.  Ms. Cook performed a cash flow analysis.  She did not express an opinion on any of the nine topics upon which Mr. Shuster opines.  *See* Ex. 4, p. 3-13 & attached sch. 3.

Mr. Shuster is well-aware that Ms. Cook was not engaged to address the issues that he attempts to raise in his rebuttal to her report.  He testified that his understanding of Ms. Cook's report was that it was "purported to represent the transactions recorded using the bank statements for one account for a period of three and three quarter years."  Ex. 3 at pp. 64-65.  He agreed that Ms. Cook had not opined whether or not the years that she was requested to analyze were

representative of the expected project cycle of St. Anselm's activities. *Id.* at p. 76-77. He agreed that she did not opine whether St. Anselm had the ability to ultimately satisfy its note holders. *Id.* at p. 80. He agreed that she did not opine on the fair market value of St. Anselm's oil and gas properties. *Id.* at p. 81-82. And, while he thought he detected some negativity on Ms. Cook's part, he could not state where Ms. Cook opined that is was not within traditional business practices to refinance short-term debts to improve liquidity. *Id.* at p. 95-97.

Mr. Shuster's opinions cannot stand alone as affirmative opinions because he did not employ a methodology or use reliable analysis. Mr. Shuster admitted during his deposition that he did <u>not</u>:

- perform an analysis of the fair market value of St. Anselm's oil and gas properties, Ex. 3 at p. 81;
- determine the portion of St. Anselm's investments that were invested in revenue producing items, Ex. 3 at p. 82;
- have an opinion whether the distributions to Wells and Palmer were reasonable based on the income and expenses that St. Anselm incurred, Ex. 3 at p. 113-114;
- have an opinion whether St. Anselm would ultimately be able to pay its obligations to the promissory note holders.

Mr. Shuster concedes that determining the fair market value of St. Anselm's oil & gas, geothermal and other partnership interests was "not within our expertise." Ex. 2*, p. 6.* Because Mr. Shuster's statements about the information that Ms. Cook purportedly should have provided in her report are

incomplete and because Mr. Shuster is not, in fact, qualified to opine on the fair market value of St. Anselm or its oil and gas properties, Mr. Shuster's opinion testimony would only serve to confuse the jury. *See* Ex. 3 at p. 116-117 (testimony admitting that his opinions were not comprehensive and did not include other important considerations, such as a company's accounts payable).

### III.   Conclusion

For the foregoing reasons, the SEC respectfully requests that the Court exclude Mr. Shuster under Rule 702 from offering any of the opinions set out in this Memorandum of Law and Fact.

Certification of Compliance with D.C.COLO.LCivR 7.1A

Pursuant to D.C.COLO.LCivR 7.1A, undersigned counsel state that they conferred on March 30, 2012 with defense counsel for the St. Anselm defendants and made a reasonable good faith effort to resolve this matter before filing.

Respectfully submitted this 30th day of March, 2012.

        s/Barbara T. Wells
        Nancy J. Gegenheimer
        Barbara T. Wells
        Trial Counsel
        U.S. Securities and Exchange Commission
        1801 California Street, Suite 1500
        Denver, CO  80202
        (303) 844-1118
        *Attorney for the Plaintiff*

CERTIFICATE OF SERVICE

       I hereby certify that on March 30, 2012, I caused a true and correct copy of the foregoing to be filed electronically using the CMF/ECF system, which will send notification to the following:

Thomas D. Birge, Esq.
tbirge@birgeminckley.com

*Attorney for Defendants Anna Wells, Mark Palmer,
Michael Zakroff, and St. Anselm Exploration Co.*

David A. Zisser, Esq.
Michelle Meyer, Esq.
David.zisser@dgslaw.com
Michelle.myer@dgslaw.com

*Attorneys for Defendant Steven Etkind*

Scott A. Meyers, Esq.
smeyers@ulmer.com

*Attorney for David Trautenberg*

                                                      s/Barbara T. Wells
                                                        Barbara T. Wells