**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 11-cv-00668-REB-MJW

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ST. ANSELM EXPLORATION CO.,
MICHAEL A. ZAKROFF,
MARK S. PALMER,
ANNA M.R. WELLS, and
STEVEN S. ETKIND,

    Defendants.

**ORDER CONCERNING MOTIONS
TO EXCLUDE UNDER FED. R. EVID. 702**

**Blackburn, J.**

This matter is before me on (1) **Plaintiff's Motion To Exclude the Testimony of Accounting Expert Steven J. Shuster, Pursuant to FED. R. CIV. EVID. 702 and Accompanying Memorandum of Law** [#71][1] filed March 30, 2012; and (2) **St. Anselm Defendants' Motion To Exclude Plaintiff's Geophysical Expert Testimony** [#72] filed March 31, 2012.  The parties filed responses [#83 & #84] and corresponding replies [#88 & #90]. I grant the plaintiff's motion in part and deny it in part.  I deny the St. Anselm defendants' motion.

---

[1] "[#71]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

## I. STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED.R.EVID. 702. The standards outlined in Rule 702 implicate, of course, the standards for admission of opinion testimony stated in the so-called *Daubert* trilogy. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The court's application of the standards of Rule 702 and the related cases is "a flexible and commonsense undertaking in which the trial judge is granted broad latitude in deciding both how to determine reliability as well as in the ultimate decision of whether the testimony is reliable." *Smith v. Ingersoll-Rand Co.*, 214 F.3d. 1235, 1243 (10th Cir. 2000) (internal quotation and citations omitted). The Supreme Court has described the court's role in weighing expert opinions against these standards as that of a "gatekeeper." *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Under *Daubert* and its progeny, an expert opinion is reliable if it is based on scientific knowledge. "The adjective 'scientific' implies a grounding in the methods and

procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." ***Daubert***, 509 U.S. at 590. In short, the touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592 - 593; **see also Truck Insurance Exchange v. MagneTek, Inc.**, 360 F.3d 1206, 1210 (10th Cir. 2004). The party proffering the expert opinion must demonstrate both that the expert has employed a method that is scientifically sound and that the opinion is "based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation." ***Goebel v. Denver and Rio Grande Western Railroad Co.***, 346 F.3d 987, 991 (10th Cir. 2003) (quoting ***Gomex v. Martin Marietta Corp.***, 50 F.3d 1511, 1519 (10th Cir. 1995)).

Rule 702 demands also that the expert's opinion be relevant, that is, that the testimony "fit" the facts of the case. ***Daubert***, 509 U.S. at 591-592; ***In re Breast Implant Litigation***, 11 F.Supp.2d 1217, 1223 (D. Colo. 1998). "'[T]he standard for fit is higher than bare relevance.'" ***In re Breast Implant Litigation***, 11 F.Supp.2d at 1223 (quoting ***In re Paoli Railroad Yard PCB Litigation***, 35 F.3d 717, 745 (3rd Cir. 1994), ***cert. denied***, 115 S.Ct. 1253 (1995)). The proffered evidence must speak clearly and directly to an issue in dispute in the case. ***Id.***

Guided by these principles, the trial court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible. ***Truck Insurance Exchange***, 360 F.3d at 1210; ***Smith v. Ingersoll-Rand Co.***, 214 F.3d 1235, 1243 (10th Cir. 2000). The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ***Goebel***, 346 F.3d at 992 (quoting ***Kumho Tire Company***, 526 U.S. at 152). Rule 702 requires that opinion

3

testimony be the product of reliable principles and methods, and that an opinion witness has applied those principles and methods reliably to the facts of the case. The reliability analysis applies to all aspects of an expert's testimony, including the facts underlying the opinion, the methodology, and the link between the facts and the conclusion drawn. ***Heller v. Shaw Indus.***, 167 F.3d 146, 155 (3d Cir.1999). Consequently, the court must make a practical, flexible analysis of the reliability of the testimony, considering relevant factors and the circumstances of the case. ***See, e.g., Kumho Tire***, 526 U.S. at 149-52; ***Heller***, 167 F.3d at 155.

Generally, "rejection of expert testimony is the exception rather than the rule." ***U.S. v. Nacchio***, 519 F.3d 1140, 1154 (10th Cir. 2008) (quoting Fed. R. Evid. 702 , 2000 Advisory Comm.'s Notes). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." ***Daubert***, 509 U.S. 579 at 596.

## II. BACKGROUND

This case is a civil enforcement action against the defendants by the United States Securities and Exchange Commission (SEC). The SEC asserts claims under § 17(a), 15usc § 77q(a), § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. These claims are, in essence, claims of securities fraud.

According to the **First Amended Complaint** [#36], the business of defendant St. Anselm Exploration Co. focused on acquiring working interests in projects that explored, developed , and sold oil and gas or oil and gas wells. ¶ 19. St. Anselm derived revenue from selling oil and gas produced from the wells in which it owned an interest and from packaging and selling its interest in wells. ¶ 19. In 2007, St. Anselm decided to expand its business to include exploration and development of geothermal wells and the

generation of geothermal power. ¶ 20. Beginning in 2007, St. Anselm's capital needs increased substantially because of its new investments in geothermal energy and because revenues from its oil and gas projects were not sufficient to pay the costs of the geothermal project. ¶ 23  By 2010, geothermal assets made up the majority of St. Anselm's asset value. ¶ 21. Defendants Michael Zakroff, Mark Palmer, and Anna Wells were personally involved in both the technical and financial aspects of St. Anselm's business. ¶ 22.

In its complaint the SEC describes St. Anselm's business, the deterioration of St. Anselm's financial condition over the period between 2007 to September of 2010, ¶¶ 38 - 52, and the defendants' efforts to obtain additional cash through promissory notes, ¶¶ 26 - 52. According to the Complaint, by 2009 St. Anselm's "revenues were insufficient to pay the costs needed to develop the geothermal assets and the costs of the oil and gas projects exceeded any revenue produced from" those projects. ¶ 39. Further, revenues from operations were not adequate to service the debt on the existing investor promissory notes or to pay the principal on maturing notes. ¶ 40. Between 2007 and 2010, St. Anselm sold new high-interest promissory notes to raise the funds necessary to pay the interest and principal due on the existing notes. ¶ 41. As a result, its debt balance grew by millions of dollars in each of these years. ¶¶ 41 - 42. In each year from 2007 to 2010, Wells and Palmer both received substantial distributions from St. Anselm. ¶ 46.

The heart of this case is the allegations of the SEC that the defendants made various material misrepresentations about the business prospects and results of operations of St. Anselm. In addition, the SEC alleges that the defendants failed to state various material facts necessary to make statements made by the defendants not misleading.  For example, according to the SEC, the defendants failed to disclose (1)

5

the crippling magnitude of St. Anselm's debt; (2) by 2009 operating cots exceeded revenues; (3) operating revenues were insufficient to service debt; and (4) St. Anselm could pay interest and principal on existing promissory notes only be selling more promissory notes, in a ponzi scheme fashion. ¶ 2. Allegedly, the defendants' statements and omissions were part of a scheme to sell promissory notes to raise more than 49 million dollars from approximately 200 investors. ¶ 1. Zakroff, Palmer, and Wells are alleged to have been aware of St. Anselm's financial condition at the relevant times. ¶¶ 53 - 56.

In 2009 and 2010, St. Anselm's revenues from operations were falling substantially, its debt load was rising substantially, and its ability to pay interest on existing debt and to pay the principal on maturing notes was fading very quickly. Despite these circumstances, St. Anselm continued to raise funds though new promissory notes to pay interest and principal on older notes with these newly raised funds. In addition, Wells and Palmer continued to take substantial distributions from St. Anselm. ¶ 46.

### III. STEVEN SHUSTER

The SEC engaged Kristina A. Cook, CPA, to perform a forensic accounting analysis of St. Anselm's sources and uses of cash during the key 45 month period form January 1, 2007, to September 30, 2010. Specifically, Ms. Cook represents that she

> examined the records available to determine the sources and uses of funds in St. Anselm's bank account ending 2986 (the "Bank Account"), and whether later investor funds were used to pay earlier investors. At your request, we also analyzed whether note proceeds were used to fund distributions to Wells and Palmer.

*Cook Report* [#71-1], p. 2. In her report, Ms. Cook says she scheduled the transactions that flowed through the St. Anselm's bank account in question and, using this method, she says she was able to account for all of the cash funds at St. Anselm, including

6

funds flowing through other accounts. In her report, Ms. Cook opines:

> (1) revenues from operations and from the sale of assets and ownership interests were not sufficient to satisfy debt service during the period from January 1, 2007, through September 30, 2010;
>
> (2) about 13.3 million dollars of the 16.1 million dollars paid by St. Anselm to defendants Anna Wells and Mark Palmer came from the proceeds of promissory notes issued between January 1, 2007, and September 30, 2010; and
>
> (3) during the period January 1, 2007, through September 30, 2010, 11.2 million dollars, or more, of the proceeds of promissory notes were used to make principal and interest payments to holders of promissory notes.
> *Cook Report* [#71-1], pp. 3 - 4.

The St. Anselm defendants, a group that includes all defendants except Steven Etkind, engaged Steven Shuster, CPA. Mr. Shuster prepared a rebuttal report responding to Ms. Cook's report. Mr. Shuster prepared his own analysis of the sources and uses of funds at St. Anselm. Mr. Shuster says he examined St. Anselm's general ledger for a six year period from January 1, 2006, through December 31, 2011, to determine St. Anselm's sources and uses of funds. *Motion to* exclude [#71], Exhibit 2 (Shuster Report) [#71-2], p. 10. Ultimately, Mr. Shuster expressed several opinions concerning Ms. Cook's analysis. The opinions challenged by the SEC in its present motion are[2]

> (1) "[I]t is Shuster's opinion that the Cook Report's Schedules 1 and 2 (¶39 and ¶40) should be challenged for their inclusiveness and accuracy of all sources and uses of funds." Shuster report at p. 8.
>
> (2) "As a result of the significant variance between the amounts of 'sources of funds' and 'uses of funds' as presented in the Cook Report and the amounts presented as debits and credits in the St. Anselm general ledger[,] it is Shuster's opinion that Ms. Cook's analysis may not be comprehensive." Shuster report at p. 10.
>
> (3) "It is Shuster's opinion that an understanding of the time interval necessary to

---

[2] The numerical designations of these opinions are the designations adopted by the SEC in its reply [#88].

explore, acquire, develop and sell geothermal energy projects as well as oil and gas projects should be considered to evaluate whether the 3.75 years of bank statements analyzed by Ms. Cook are representative of the expected project cycle for these activities." Shuster report at p. 7.

(4) "It is Shuster's opinion that the exclusion of . . . information [about the changes in the market value of various investments held by St. Anselm] is a limiting factor to [the Cook] schedules' utility as a means to evaluate the ability of St. Anselm to ultimately satisfy its obligations to [sic] notes payable." Shuster report at p. 7.

(5) "It is Shuster's opinion that [Cook's finding that $11.2 million or more of proceeds from the issuance of promissory notes were used to make interest and principal payments to holders of promissory notes during the 45-month period] . . . is a finding consistent with traditional business practices employed by many private or public companies in the United States whereby short-term debts are refinanced to improve or restore liquidity allowing those companies to continue operations. . . . [W]e would expect that the refinancing of St. Anselm's obligations would necessarily entail cash flows from new notes payable and would provide a source of funds to extinguish
maturing obligations." Shuster report at p. 9.

(6) "It is our opinion that it is reasonable for a business to distribute a portion of the proceeds from the sale of assets and ownership interests to the business equity owners." Shuster report at p. 9.

(7) "It is Shuster's opinion that a user of Ms. Cook's conclusions should be mindful of the recession experienced by the United States during the last several years." Shuster report at p. 9.

(8) "It is our opinion that it is reasonable for a business to distribute a portion of the proceeds from the sale of assets and ownership interests to the business equity owners." Shuster report at p. 9.

(9) "[I]t is Shuster's opinion that since the Company maintains its books and records on the Income Tax Basis of accounting [,] it is necessary to consider the fair market value of the oil & gas, geothermal and other partnership interests which St. Anselm lists as assets to determine the ability of the Company to pay its obligations." Shuster report at p. 10.

(10) "The length of the cycle from exploration to development to sale may have a significant impact on the timing of cash flows received by St. Anselm." Shuster report at p. 12.

(11) "[T]he company and its lenders should not have expected the 'revenues from oil and gas alone' to be 'sufficient to service debt.' " Shuster report at p. 15.

8

### A.  Opinions (1) and (2)

The SEC argues that opinions (1) and (2) should be excluded under Rule 702 because the opinions are not based on sufficient facts and data, the methods used by Schuster are not reliable, and Shuster did not employ the rigor expected of an expert in the filed of accounting.  The SEC contends that Shuster did not determine the reliability of the information contained in the general ledger on which he relied as a source of factual data and argues that Shuster's failure to conduct certain additional analysis of certain entries on the general ledger renders his analysis unreliable.

Under Rule 702, opinion testimony must be "'based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation.'"  **Goebel v. Denver and Rio Grande Western Railroad Co.**, 346 F.3d 987, 991 (10th Cir. 2003) (quoting **Gomex v. Martin Marietta Corp.**, 50 F.3d 1511, 1519 (10th Cir. 1995)).  Essentially, Cook and Shuster disagree over the proper data to use when conducting an analysis of St. Anselm's sources and uses of funds.  Nothing in the record demonstrates that the St. Anselm general ledger used by Shuster is inherently unreliable as a source of facts to determine St. Anselm's sources and uses of funds.  The fact that Shuster did not include in his analysis the additional analytical steps suggested by the SEC does not so undermine his analysis that it is rendered unreliable.  Any questions about the reliability of the general ledger as a source of facts and criticisms of Shuster's method of analysis go to the weight to be accorded to his opinions and not to their admissibility.

### B.  Opinions (3), (4), (7), (9), and (10)

The SEC contends these opinions are not admissible because they are not responsive to Cook's opinions, are not supported by sufficient facts and data, are not

9

based on any methodology, and are not within Shuster's area of expertise. In the context of this case, I find that opinions (3), (4), (9), and (10) are supported by sufficient facts and data. Shuster had facts and data in the form of information about St. Anselm's business. *Response* [#83], Exhibit A [#83-1] (containing Appendices to Shuster's report), CM/ECF pp. 3 - 6. Generally, Schuster ties opinions (3), (4), (9), and (10) to the facts and data about St. Anselm. Shuster's opinions are within his expertise in accounting.[3] Further, I conclude that these opinions are based on a reasonably reliable methodology. Generally, these opinions concern Shuster's assessment of the factors that should be considered when evaluating St. Anselm's ability to pay its debts. As stated in his report, Shuster's opinions are based on the traditional accounting method of determining the factors relevant to the assessment of the future prospects of a business.

The SEC notes that Shuster is not qualified to opine on the fair market value of St. Anselm itself or its oil and gas, geothermal, and partnership interests. Shuster does not give opinions valuing these assets. Rather, Shuster opines that valuation of these assets is necessary to a proper assessment of St. Anselm's ability to pay its obligations. The fact that Shuster is not qualified to opine about these valuations does not undermine the bases for his opinion that such valuations are necessary to a proper assessment of St. Anselm's ability to pay its obligations. Finally, even if some of these opinions are not directly responsive to Cook's opinions, that fact alone does not make these opinions inadmissible. On this basis, I conclude that opinions (3), (4), (9), and (10) are admissible under Rule 702.

---

[3] My conclusion concerning the scope of Shuster's expertise is based on a review of his Cirriculum Vitae. *Response* [#83], Exhibit A [#83-1] (containing Appendices to Shuter's report), CM/ECF pp. 8 - 10.

However, I conclude that the defendants have not demonstrated the relevance of opinion (7) – "It is Shuster's opinion that a user of Ms. Cook's conclusions should be mindful of the recession experienced by the United States during the last several years." Rule 702 demands also that the expert's opinion be relevant, that is, that the testimony "fit" the facts of the case. *Daubert*, 509 U.S. at 591-592; *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1223 (D. Colo. 1998). "'[T]he standard for fit is higher than bare relevance.'" *In re Breast Implant Litigation*, 11 F.Supp.2d at 1223 (quoting *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 745 (3rd Cir. 1994), *cert. denied*, 115 S.Ct. 1253 (1995)). The proffered evidence must speak clearly and directly to an issue in dispute in the case. *Id.*

In his report, Shuster opines that a user of Ms. Cook's conclusions should be mindful of the recent recession, but he does not tie the fact of the recession to St. Anselm's business during the relevant time period. Rather, in the sentences following his statement of this opinion, he discusses other specific facts and their relationship to St. Anselm's business. Absent some demonstration of how the fact of the recession is relevant specifically to an assessment of St. Anselm's business, this opinion does not speak clearly and directly to an issue in dispute in this case. Therefore, opinion (7) must be excluded.

C.  Opinions (5), (6), (8), and (11)

The SEC contends opinions (5), (6), (8)[4], and (11) are not admissible because they are not responsive to Cook's opinions, are not supported by sufficient facts and data, are not based on any methodology, and are not within Shuster's area of expertise.

---

[4] Opinion (8) is identical to opinion (6).

11

In its reply, the SEC contends these opinions are simply advocacy statements, and not expert opinions.

Opinion (5) concerns whether or not it is consistent with traditional business practice to refinance debt in the way St. Anselm allegedly refinanced its debt. Opinion (6), which is identical to opinion (8), concerns the reasonableness of cash distributions by a business to the owners and equity owners of the business. Opinion (11) responds to Cook's opinion that in the relevant period revenues from oil and gas alone were not sufficient to service St. Anselm's debt. Shuster responds that because St. Anselm is not in the business of producing oil and gas, the company and its lenders should not have expected revenues from oil and gas, alone, to be sufficient to service debt.

In the context of this case, I find that opinions (5), (6), (8), and (11) are supported by sufficient facts and data. Again, Shuster relied facts and data in the form of information about St. Anselm's business. *Response* [#83], Exhibit A [#83-1] (containing Appendices to Shuster's report), CM/ECF pp. 3 - 6. Generally, Schuster ties these opinions to the relevant facts and data about St. Anselm. Shuster's opinions are within his expertise in accounting. Further, I conclude that these opinions are based on a reasonably reliable methodology. As with most of his other opinions, these opinions concern Shuster's assessment of the factors that should be considered when evaluating St. Anselm's ability to pay its debts. Even if some of these opinions are not directly responsive to Cook's opinions, that fact alone does not make these opinions inadmissible. On this basis, I conclude that opinions (5), (6), (8), and (11) are admissible under Rule 702.

### D. Conclusion

Opinion (7), in which Shuster opines that a user of Ms. Cook's conclusions

12

should be mindful of the recent recession, is not admissible under Rule 702 because this opinion, as stated in Shuster's report, is not tied to the facts of this case. Otherwise, Shuster's challenged opinions, as summarized above, are admissible under Rule 702.

## IV.  LESLIE  S. O'CONNOR

The SEC engaged Leslie O'Connor to express opinions about the value St. Anselm's interest in oil and gas wells and the value of St. Anselm's interest in geothermal leases at certain points in time.  All defendants, except Steven Etkind, contend that Ms. O'Connor's opinions are not admissible under the standards of Fed. R. Evid. 401, 402, 403, and 702.  The defendants argue that Ms. O'Connor's opinions are not admissible because they are not relevant and do not fit the issues in this case, and because Ms. O'Connor's methodology is not sufficiently reliable.  Ms. O'Connor's report is attached to the defendants' motion.  *Motion to exclude* [#72], Exhibit A (O'Connor Report).

### A.  Relevance

In the **First Amended Complaint** [#36], the SEC alleges that by 2010, geothermal assets made up the majority of St. Anselm's asset value.  Ms. O'Connor's asset valuation opinions do not reflect that geothermal assets made up the majority of St. Anselm's asset value in 2010.  The balance in the values of St. Anselm's oil and gas versus geothermal assets is not the lynchpin of the SEC's claims.  The fact that Ms. O'Connor's valuations do not mirror precisely the allegations in the complaint, without more, does not render these opinions irrelevant under Rule 401, or inadmissible as opinion testimony under Rule 702.  Rather, the valuation of St. Anselm's assets is directly relevant to the question of whether the defendants misrepresented St. Anselm's

financial status during the time period in question. Ms. O'Connor's valuations address this key point and, therefore, her opinions are relevant and they fit the facts of this case.

According to the defendants, the allegedly fraudulent statements at issue in the complaint included estimated valuations of interests in oil and gas leases that were unproven and undeveloped. Ms. O'Connor valued oil and gas interests that included proven and producing wells as well as interests that were proven but undeveloped. She did not value leases held by St. Anselm that were unproven. Because Ms. O'Connor did not value all of the assets at issue in the defendants' statements, the defendants assert, her report "will not be probative of the truth or falsity of statements about assets other than reserves." *Motion*, p. 6. I disagree.

Ms. O'Connor did not value every asset of St. Anselm, but she did value significant assets of St. Anselm during the time period at issue in the complaint. Even if Ms. O'Connor's valuations do not provide a complete picture of the value of all of St. Anselm's assets at the relevant times, her opinions do provide valuations of substantial and significant portions of St. Anselm's assets at those times. Those valuations are key considerations when determining St. Anselm's overall financial status at those times. A determination of St. Anselm's financial status at those times is a crucial guide to a determination of the truth or falsity of the statements made by the defendants that are at issue in this case. Ms. O'Connor's opinions about valuation speak clearly and directly to issues in dispute in this case. Her opinions are relevant, as that term is broadly defined in Rule 401 and, for the purposes of Rule 702, her opinions fit the facts of this case.

### B. Methodology

On two bases, the defendants argue that Ms. O'Connor's valuation opinions are

14

based on flawed methodology. First, they argue that Ms. O'Connor's failure to value oil and gas leases that were unproven and undeveloped demonstrates that her valuation methodology is so flawed that it is not reliable. Second, the defendants contend that Ms. O'Connor's method of valuing St. Anselm's geothermal assets also is fatally flawed.

As with their relevance argument, the defendants argue that Ms. O'Connor failed to value oil and gas leases that were unproven and undeveloped. The defendants argue that this failure demonstrates that Ms. O'Connor's methodology is fatally flawed. For example, the defendants note that St. Anselm's investment in a package of leases known as the Emerald and West Emerald prospects. Ms. O'Connor did not value these interests, yet in 2011 St. Anselm sold these interests for about 19.3 million dollars. The fact that Ms. O'Connor did not value every St. Anselm asset does not render her valuation opinions unreliable. The defendants do not challenge the methods used by Ms. O'Connor to value proven and developed leases, or proven but undeveloped leases. Those assets were a significant portion of St. Anselm's overall value at the relevant times. The fact that unproven leases are not included in Ms. O'Connor's analysis may indicate that her valuations do not present the full picture of St. Anselm's assets. However, the fact that Ms. O'Connor did not value all of St. Anselm's assets does not undermine the validity of the methods used by Ms. O'Connor to value St. Anselm's proven and developed oil and gas interests and its proven but undeveloped oil and gas interests. To the extent Ms. O'Connor's failure to value unproven and undeveloped leases demonstrates a flaw in her analysis, that issue is ripe for cross examination and the presentation of contrary and supplemental evidence.

The defendants challenge also Ms. O'Connor's method for valuing St. Anselm's geothermal assets. Ms. O'Connor valued St. Anselm's geothermal leases using Bureau

15

of Land Management geothermal lease sales data. "I relied upon BLM geothermal lease sales data to value [St. Anselm's] leases, by year, and dependent upon the stage of development." *O'Connor Report*, p. 5. The defendants note that Ms. O'Connor did not compare the resources indicated in St. Anselm leases "with the resources, if any, indicated in the BLM lease sale data." *Motion*, p. 7. Such a comparison, the defendants contend, would determine if the St. Anselm leases were of a quality equivalent to the leases in the BLM lease sale data.

In valuing the geothermal leases, Ms. O'Connor relied on St. Anselm's representation that St. Anselm did not intend to generate geothermal power on the leased sites. Rather, St. Anselm intended either to sell the leases to someone in the generation business, or possibly to form a joint venture with someone in the generation business. *Response* [#84], p. 14. Ms. O'Connor says this comparable sales approach is standard and constitutes an accepted practice in the energy industry. *Id.*, Exhibit 1 (O'Connor Declaration). The comparable sales methodology adopted by Ms. O'Connor is reasonably reliable and provides a sufficient foundation for her opinions of the value of St. Anselm's geothermal assets. To the extent her methodology may be flawed, as applied to the facts of this case, that issue is ripe for cross examination and the presentation of contrary and supplemental evidence.

### C. Rule 403

Although the defendants cite Rule 403 at the beginning and at the end of their motion, they do not present any argument specifically relevant to Rule 403. Under Rule 403 relevant evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or the needless presentation of cumulative evidence. Fed. R.

16

Evid. 403. In view of the fact that O'Connor's opinions are relevant, fit the facts at issue in this case, and are based on reasonably reliable methodologies, I conclude that there is no basis to exclude O'Connor's opinions under Rule 403. The probativity of this relevant evidence is not substantially outweighed by any of the dangers identified in Rule 403.

### III. CONCLUSION & ORDERS

With one exception, Mr. Shuster's opinions are admissible under the standards of Rule 702. Only Mr. Shuster's opinion that a user of Ms. Cook's conclusions should be mindful of the recent recession does not satisfy the standards applicable under Rule 702. Therefore, that opinion must be excluded under Rule 702. Ms. O'Connor's opinions are relevant and are admissible under the standards of Rule 702. Ms. O'Connor's opinions are not subject to exclusion from evidence under Rules 401, 402, or 403.

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Plaintiff's Motion To Exclude the Testimony of Accounting Expert Steven J. Shuster, Pursuant to FED. R. CIV. EVID. 702 and Accompanying Memorandum of Law** [#71] filed March 30, 2012, is **GRANTED** as to the opinion of Steven Shuster that "a user of Ms. Cook's conclusions should be mindful of the recession experienced by the United States during the last several years";

2. That the opinion of Steven Shuster specified in paragraph one (1.), above, is **EXCLUDED** from evidence;

3. That otherwise, the **Plaintiff's Motion To Exclude the Testimony of Accounting Expert Steven J. Shuster, Pursuant to FED. R. CIV. EVID. 702 and Accompanying Memorandum of Law** [#71] filed March 30, 2012, is **DENIED**; and

4. That the **St. Anselm Defendants' Motion To Exclude Plaintiff's Geophysical Expert Testimony** [#72] filed March 31, 2012, is **DENIED**.

Dated July 19, 2012, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge