**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 11-cv-00668-REB-MJW

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ST. ANSELM EXPLORATION CO.,
MICHAEL A. ZAKROFF,
MARK S. PALMER,
ANNA M.R. WELLS, and
STEVEN S. ETKIND,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

**Blackburn, J.**

      This case came before me for trial to the court from July 23 through August 2, 2012, on the claims of plaintiff, United States Securities and Exchange Commission (SEC), for misrepresentation pursuant to section 17(a)(2) of the Securities Act of 1933[1] and SEC Rule 10b-5(b)[2] promulgated under section 10(b)[3] of the Securities Exchange Act of 1934, as well as scheme liability pursuant to sections 17(a)(1) and (3) of the Securities Act[4] and SEC Rules 10b-5(a) and (c) as set forth in the SEC's **First**

---

[1] 15 U.S.C. § 77q(a)(2).

[2] 17 C.F.R. § 240.10b-5(b).

[3] 15 U.S.C. § 78j(b).

[4] 15 U.S.C. § 77q(a)(1) & (3).

**Amended Complaint** [#36][5] filed July 5, 2011, and identified in the **Final Pretrial Order** [#100] filed June 12, 2012.

All parties appeared through their respective attorneys.  Additionally, the individual defendants, Michael A. Zakroff, Mark S. Palmer, Anna M.R. Wells, and Steven S. Etkind, appeared in person.

At the close of plaintiff's case, defendants moved for entry of judgment as a matter of law under Fed. R. Civ. P. 52(c).  I deferred ruling on the motion and allowed defendants to present their evidence.  Defendants have now renewed their motion.

(**Defendants' Motion for Judgment Pursuant to F.R.C.P. 52(c)** [#141] filed August 17, 2012.)

Having judicially noticed all relevant adjudicative facts in the file and record of this case pro tanto, considered the evidence educed at trial in its various forms, determined the credibility of the witnesses, weighed the evidence, considered all reasons stated, arguments advanced, and the authorities cited by the parties in both written and oral form, and being otherwise sufficiently advised, I grant defendants' Rule 52(c) motion based on the following findings of fact (which have been established by a preponderance of the evidence) and conclusions of law and enter appropriate orders, and judgment.[6]

---

[5] "[#36]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF).  I use this convention throughout this order.

[6] As required by Fed. R. Civ. P. 52(a)(1), I state my findings of fact specially and conclusions of law separately. Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

## I.  FINDINGS OF FACT

1.  I have jurisdiction over the parties to this action pursuant to 15 U.S.C. §§ 77t(b) & 77v(a) (Securities Act), 78u(d), 78u(e), and 78aa (Exchange Act).

2.  Venue is proper in the United States District Court for the District of Colorado.

3.  Defendant St. Anselm Exploration Co. ("SAE") is a privately held corporation formed under the laws of Colorado and operating out of its office in Denver, Colorado.

4.  Defendants, Anna M.R. Wells and Mark Palmer, both trained geologists, are the president and vice president, respectively, of SAE, and together founded the company in 1989.  With defendant, Michael Zakroff, SAE's secretary/treasurer and business manager, they comprise the company's three principals who together own one hundred per cent (100%) of the company's stock.[7]  Defendant, Steven Etkind, was SAE's vice president of corporate development, who was primarily responsible for investor development and relations.

5.  SAE is engaged in the business of oil and gas exploration and development and, since 2007, exploration and development of geothermal energy.

6. St. Anselm CKU ("CKU") was a limited liability company formed by SAE with Hat Creek Energy ("Hat Creek") in February 2006.  Through CKU, SAE conducted oil and gas activities in Kansas with Murfin Drilling Company ("Murfin") from March 1, 2006, until March 1, 2009.  SAE formed St. Anselm KXP ("KXP") to carry on its oil and gas activities in the Murfin drilling program after the dissolution of CKU.

---

[7]  At the times relevant to this lawsuit, Ms. Wells owned 67% of the stock and Mr. Palmer 33%. Mr. Zakroff, who was previously married to Ms. Wells, received a portion of her stock when the couple divorced.

7.  Agua Caliente ("Agua") and Standard Steam Trust ("SST") are LLCs formed to acquire geothermal leases in 2007 and 2008, respectively.  Terra Caliente ("Terra"), another LLC formed by SAE, owned interests in both Agua and SST and was the manager of both LLCs until 2012.

8.  The SEC presented its case as relying on two primary misrepresentations: (1) that investor funds would be used to advance the company's operations, specifically drilling and property acquisition; and (2)  that payments to investors would be funded by the operations of the company (primarily from asset sales) – as well as two primary omissions: (1) that investor funds were used to pay off existing debt; and (2) that the company had insufficient funds to pay ongoing expenses without raising new capital from promissory notes.

9.  The evidence fails to establish that SAE had any of the true hallmarks of a Ponzi scheme.  SAE conducted legitimate business operations and historically (and contemporaneously) produced profits and earnings.  The evidence established plainly that SAE and its affiliates had real assets that had actual and potential value and that SAE conducted significant, legitimate business operations.

10.  SAE's business plan is to identify and acquire oil, gas, and geothermal, prospects, usually in partnership with others, to enhance their value by developing them further, and then to sell them for a profit.  SAE is not involved directly with the production of the oil and gas properties in which it owns an interest or the construction of power plants on its geothermal properties.

11.  The process of developing a prospect to the point where it viably can be sold typically requires several years.  By contrast, the SEC's proffered expert, Christina

Cook, cabined her review of the evidence to the time period between January 1, 2007, and September 30, 2010, and she considered only cash infusions to the company, taking no account of SAE's assets or the growth of assets unless and until they had been monetized.  In other words, she gave no consideration to the potential value – however well supported – of non-liquid assets.

12.   To fund its operations, SAE historically relied, in part, on the issuance of promissory notes.  These notes were typically for one- or three-year terms and carried high interest rates.  Every note issued by the company was personally guaranteed by the principals of SAE.[8]

13.   When considered over a period representing the typical business cycle in the industry, SAE had adequate revenue apart from income from promissory notes to pay its debt – both principal and interest – to note holders.  SAE took in $61 million in revenue from sources other than promissory notes during between 2006 and 2010, inclusive, more than sufficient to service the $57 million in debt – both principal and interest – during that same time period.  Even over the more limited period Ms. Cook considered (rather than on a year-by-year basis), only twenty per cent (20%) of the revenue attributable to the sale of promissory notes was used to service the company's debt.

14.   All holders of promissory notes made by SAE and/or its affiliates also were "accredited investors," meaning, most significantly, that those holders were presumed to

---

[8]   Contrary to the implication of the SEC's arguments, the fact that SAE's principals did not have adequate resources to cover these guarantees at the moment they might have been called is irrelevant. The salient feature of such a guarantee is that it gave each principal skin in the game, making them personally liable should the company default on its obligations.

be sophisticated and aware of the risks inherent to the industry, and thus the risk involved in the investment. *See* 17 C.F.R. § 230.501(a).[9] *See also* Goodlett, Martin, *Subjective Materiality and the Over-the-Counter Derivatives Markets*, 61 DePaul L. Rev. 165, 190 (Fall 2011).

15.   SAE's operations were funded also by sales of assets, periodic infusions of capital from the shareholders,[10] and loans from industry partners.  Because developing a lease to the point where it could be monetized typically takes several years, asset sales were episodic and did not provide a regular infusion of cash to the business. SAE's comptroller, Tania Hattig, testified that SAE had a regular practice of "bridging the gap" between asset sales by relying on these other sources of funding.  When an asset sale was consummated, however, the company typically realized millions of dollars.

16.   Each accredited investor who was issued a promissory note by SAE or one of its affiliated entities signed a Subscription Agreement.  Therein, investors acknowledged that "[t]here are no constraints on the company's use of cash, whether from financings or operations. . . . Cash, including proceeds from debt financings, has

---

[9]   The SEC's Regulation D rules governing accredited investors "relates to transactions exempted from the registration requirements of section 5 of the Securities Act of 1933 . . ." 17 C.F.R. § 230.500(a). However, "[s]uch transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws," and "[i]ssuers are reminded of their obligation to provide such further material information, if any, as may be necessary to make the information required under Regulation D, in light of the circumstances under which it is furnished, not misleading." *Id.*

[10]   The SEC presented evidence intended to demonstrate that SAE's principals paid themselves large distributions as the company's cash flow was dwindling. Yet these same principals also made significant loans to the company during the relevant period and exerted significant efforts to grow the business and increase its profitability.  The environment in which they did business was inherently risky, as this case demonstrates, and I perceive nothing inherently suspect in these defendants reaping rewards commensurate with such risks.  More specifically, I reject the SEC's attempt to paint defendants as mere rogues, living a high-budget, jet-setting lifestyle at the expense of unsuspecting investors.

been and will continue to be used at the discretion of the board of directors of the company[.]"  (Tr. Exh. 33 ¶ 2(c)(i) at 002491.)  Following this language was an enumerated list of potential uses of cash.  At an earlier point in time, this section had stated explicitly that one such purpose was financing the company's debt.  That language was removed from the Subscription Agreement in 2007. The resultant Subscription Agreement stated more generally that cash could be used "for other purposes."  (*Id.*)[11]

17.  Although the SEC presented the testimony of three investors – Laura Tolley, Susan Gaultney, and Peter Conley – who claimed that they believed the company used their investment funds strictly to finance oil and gas operations, I find this testimony not credible, both in light of the plain language of the Subscription Agreements (with or without the specific reference to debt financing) and in light of the witnesses' concessions that the company could use incoming funds for any proper business purpose.  It is beyond peradventure that servicing company debt is a proper business purpose.

18.  Instead, I credit the testimony of Mr. Etkind and Ms. Hattig that any investor who specifically inquired about the way in which funds were used was explicitly told about the company's periodic practice of "bridging the gap" between asset sales by relying on funds from the issuance of new notes to fund existing interest payments.

19.  The evidence demonstrates that SAE's business plan, including the use of

---

[11]  The Subscription Agreements are one of the four main categories of written communications on which the SEC bases its arguments that defendants committed fraud by omission.  The other three are (1) periodic activity update letters; (2) periodic "Dear St. Anselm Note Holder" letters; and (3) email communications with individual investors.

new infusions of investor funds to finance repayments to existing note holders, together with other sources of income, worked well in its initial years.  The company had adequate income from all sources to service its existing debt and grow its business.

20.  In December 2008, the company's principals convened a meeting of investors, both existing and potential, in Albuquerque, New Mexico.  There was little actual evidence of what actually was communicated to investors at this meeting, and no one who testified at trial could provide anything more than broad generalizations about the types of matters that were discussed.  In general, however, it appears that SAE's principals discussed the company's business and prospects, both on the oil and gas side and the geothermal side.

21.  At the time of the Albuquerque meeting, SAE's prospects looked justifiably bright.  Beginning in 2007, the Bureau of Land Management, which had not leased land for many years previously, decided to allow the public to lease properties capable of generating geothermal energy.  SAE attended the first BLM auction in June 2007, and was the successful bidder on several leases.  Ultimately, Agua and SST together participated in leases on ten geothermal properties in Idaho, Utah, and Nevada.

22.  Ms. Wells testified in detail regarding her extensive scientific investigation of the prospects for geothermal in several regions of the country prior to the first lease purchases.  In estimating the potential value of the properties, she confirmed her own conclusions first with an independent contractor working internally and then by commissioning reports from a well-respected outside consulting firm, Geothermex.  All these estimates suggested the potential for significant geothermal resources.  (*See* Tr. Exhs. 377, 382, 392.)

23.   The Mary's River property represented the largest geothermal resource Geothermex had ever mapped in Nevada.  The company's internal investigations of the potential wattage (and concomitant value) of the properties was supported by independent estimates.  The estimate of the eight properties owned by SST alone suggested a total value of $267 million.  (*See* Tr. Exh. 385.)

24.   In addition, SAE was approached by various third parties interested in acquiring or partnering with the company on one or more of these properties. This third-party interest justifiably increased the company's confidence in the inherent value of these assets once they had been developed sufficiently to be sold.

25.   In December 2009, SAE approached Ormat, an international developer of geothermal plants, regarding a sale of some of the geothermal properties.  Ormat quickly agreed to purchase three parcels – Edwards Creek, Mary's River and Mary's River Southwest, and Newdale – in separate transactions to be consummated *seriatim*.

26.   At the time these properties were acquired and through at least the second quarter of 2010, defendants reasonably believed that these geothermal leases constituted an enormous asset that could eventually be monetized to significant profit for the company.

27.   Simultaneously, SAE continued its work on the oil and gas side via CKU, and later, KXP.  Mr. Palmer was primarily responsible for this aspect of the business.

28.   Mr. Palmer relied on models, which he had developed in his previous employment with Phillips Petroleum, to estimate the value of the company's oil and gas assets.  These models were based on historical drilling information maintained by both SAE and Murfin as well as reserve reports issued by a respected petroleum engineer,

Jack McCartney.  (**See** Tr. Exhs. 360, 363, 366, 381, 400.)  They contained data regarding operating expenses, wells planned to be drilled in the coming year, upcoming capital expenditures, and seismic information.[12]  (**See** Tr. Exhs. 289, 375, 376, 380, 394.)  Mr. Palmer's models included information regarding both hard and intangible assets of the company.  The information thus generated routinely was incorporated into the company's periodic written communications with investors.

29.   The SEC's proffered rebuttal expert on this issue, Leslie O'Connor, admitted on cross-examination that she did not know how SAE's purported success ratios for drilled wells were derived, whether they applied to all Murfin's wells in Kansas or just those in which SAE participated, or whether they applied to wells drilled with the assistance of 3D seismic.[13]  Ms. O'Connor considered no historical data prior to 2008 to give context to Mr. Palmer's assumptions, nor did she place any value on SAE's intangible rights or unproven or undeveloped leaseholds.  There was no evidence offered to suggest that SAE's consideration of the value of such unproven assets was unsound either in theory or practice.

30.   In March 2009, Hat Creek elected to withdraw from CKU and paid SAE $4.1 million in a reserve sale.[14]  However, Hat Creek declined Murfin's offer to participate in future prospects in the Kansas drilling program.  SAE elected to acquire those rights,

---

[12]  SAE's agreement with Murfin harkened back to 2002 and involved the exploration of properties in Kansas and Nebraska located generally in a geologic area known as the Central Kansas Uplift. (Tr. Exh. 409.)

[13]  In fact, and only by way of example, Mr. Palmer relied on a fifty per cent (50%) success rate for wells drilled with 3D seismic, much less than the seventy per cent (70%) success ratio found for commercial operations in Kansas generally.

[14]  Previously, in September 2008, SAE had sold a portion of its oil and gas reserves to Hat Creek for more than $11 million.

which were then contributed, along with its existing wells and other rights in the Murfin

drilling program, to the newly formed KXP.  The principals of SAE collectively loaned the

company $2 million to finance the acquisition of these rights, for which they paid Murfin

$5.8 million.[15]  Murfin, wanting to see KXP succeed, suspended interest due it on

receivables from KXP in 2009.

31.  In August 2009, KXP successfully bid on the leases for two oil and gas

prospects in Kansas, Emerald and Emerald West.  These parcels represented the last

five per cent (5%) of property available in the 140,000-plus contiguous acre parcel

colloquially known as "Woolsey," after the 82-year old Kansas oilman who had

aggregated the parcel.  The Woolsey land was estimated to have enormous value.

Indeed, on its investment of approximately $1.8 million, SAE eventually realized more

than $19 million in revenue when the Emerald and Emerald West properties were sold

in July 2011.

32.  By this point in 2009, SAE estimated that it would have wells and reserves

by early 2010 in which KXP's interest would have a market of value of between $15

million and $18 million, an estimate that was supported by a reserve report from an

independent third party.

33.  Meanwhile, the geothermal side of the business continued to show

enormous promise.  In August 2009, SST began to develop an Initial Public Offering

(IPO) for the Toronto stock exchange.  Mr. Zakroff and David Trautenberg, SST's vice

president of finance, worked extensively on the IPO through the remainder of 2009.

---

[15]  The company hoped eventually to find other partners to participate in KXP and share the financial burdens of the related Murfin drilling program.  In 2009 and 2010, it sold 35% of its interest in KXP in different increments to four, separate investors for a total of $5.6 million.  (*See* Tr. Exh. 410.)

34.   Negotiations with Ormat regarding the Edwards Creek lease culminated in a sale on March 31, 2010, for $8.72 million, netting SAE $1.1 million.  The parties then took up the St. Mary's properties, discussing a putative price of $11.1 million.  These discussions continued through the end of 2009 and appeared likely to be consummated during the first or second quarter of 2010.  Nothing in the evidence suggests that defendants did not reasonably contemplate the closing of these transactions within that time frame.

35.   Moreover, as Ms. Cook admitted on cross-examination, SAE had sufficient income from sources other than notes to pay both interest and principal on the debt in 2008, and to pay interest only in 2007 and 2009.

36.   Nevertheless, given the rapid expansion of SAE's geothermal business and its increasing investment in the Murfin drilling program through KXP, coupled with a relative dearth of asset sales, SAE began to experience more pressing problems with its cash flow in late 2009.

37.   In a Christmas Eve series of email exchanges, Mr. Etkind and Mr. Zakroff discussed the company's financial situation and the fact that payments for January 2010 might be delayed.  Mr. Etkind suggested that he saw little chance of bringing in new investors to bridge the gap in time to make payments when due.  It was then determined to sell points in Terra.  (Tr. Exh. 52.)

38.   Then, in early 2010, another large oil and gas company in the Albuquerque area was revealed to be a Ponzi scheme and filed for bankruptcy.  Because many of the investors in that business were note holders of SAE,  there were concerns about a "run on the bank" scenario occuring.  Moreover, the company experienced a noticeable, but

ultimately ephemeral, difficulty in bringing in new investors.

39.   At the same time, the geothermal industry had begun to soften due to a number of unforeseen market factors.  The BLM began to reevaluate and tighten its leasing requirements in response to concerns over environmental impacts on sage grouse habitats on BLM lands.  In addition, the valuations of two highly valued IPOs from July 2009, declined significantly in the third quarter of 2010.  Moreover, three other major power developers had projects that were significantly delayed, over budget, and/or underperforming.  Some of those companies failed, and the market for SAE's properties thus was diluted as others became readily available.

40.   As a result of these external events, the IPO of SST fizzled out and the anticipated reserve sale to Ormat of the St. Mary's geothermal leases was delayed.

41.   On the oil and gas side, uncertainties about the future price of oil served to delay a reserve sale that the company had anticipated being able to consummate in the first half of 2010.[16]

42.   Throughout this period, SAE continued to solicit new participants through the issuance of new promissory notes and to seek renewals of existing notes.

43.   Several investors who were unsure whether to renew or chose not to renew nevertheless agreed to let SAE continue to hold their notes and pay them interest until unspecified future dates when it was anticipated that asset sales might be completed.

44.   Nevertheless, as a result of this confluence of events, on July 23, 2010, Mr. Etkind sent Mr. Zakroff a letter in which he informed the company that

---

[16]   The estimated value of the assets SAE intended to sell, confirmed by McCartney, was $15 million to $18 million, with a net return to SAE of $9.75 million to $11.7 million.  This reserve sale was ultimately consummated in November 2010.

> given St. Anselm's current inability to meet its obligations
> with respect to existing notes . . . I do not believe I can or
> should pursue new investment leads until the situation
> regarding the existing notes is resolved. . . . [G]iven the
> representations which must be made to prospects regarding
> the financial health of the company in the marketing of new
> notes, I believe this is the only proper course.

(Tr. Exh. 234.)  The company agreed and quickly hired consultants to advise it on

appropriate terms for restructuring its debt.

45.  On August 2, 2010, SAE informed note holders that it would be unable to

make its July interest payments on time.  (Tr. Exh. 235.)

46.  Finally, on August 16, 2010, the company sent a letter to note holders

notifying them that it would be restructuring its debt, explaining that despite the

underlying value of the company's assets, recent market events "ha[ve] caused us to

reevaluate the corporate finance model that has served us so well in the past:"

> Due to the financial crisis and [oil] price slump, we have
> encountered significant delays in moving our properties to
> market, but at the same time, we have had to continue
> spending capital to accumulate and validate properties.
> While we have been able to service current debt with a
> combination of proceeds from new debt and asset sales, we
> have decided that it is not appropriate to continue raising
> debt.  As a result, St. Anselm is experiencing, and unless
> corrective action is taken, will continue to experience
> substantial cash flow deficits.
>
> We believe it is imperative, for the benefit of all note holders,
> to restructure all the existing debt now to enable us to pay
> interest and principal solely from internally generated funds.
> Please note that although we had expected to close an oil
> and gas reserve sale by August 15, which would have
> funded interest payments for July and August; the sale did
> not occur.  After extensive modeling of future cash flows, it
> has been determined that even if the sale does occur, we
> could not continue to service debt at existing interest levels.
> As a result, both the July and August 2010 interest payments

14

> will be capitalized into the principal amount of the new note, and the first quarterly interest payment will be on October 1, 2010, to cover interest at the new rate for July, August and September. III effect, this capitalization of July and August 2010 interest at existing rates can be viewed as an incentive for participating in the debt restructure program

(Tr. Exh. 201.)

47.  Under the terms of the restructure, existing notes were rolled over into new, five-year notes bearing a fixed rate of interest of five percent (5%).

48.  Also, based on the advice of the consultants, SAE issued complete refunds to noteholders who had invested after June 28, 2010.

49.  Not surprisingly, not all note holders were happy with the proposed terms of the restructure.  Nevertheless, 196 of the 198 note holders ultimately accepted the terms of the restructure and were issued new notes on the terms proposed by the company.[17]

50.  No evidence suggests that any note holder lost principal as a result of the restructure.

51.  The totality of the evidence presented does not support a finding that, prior to July 23, 2010, any defendant acted with an intent to deceive, manipulate, or defraud in their communications with investors about the state of the company, or that their conduct constituted an extreme departure from the standards of ordinary care, one which they either knew presented a danger of misleading note holders or that was so obvious that defendants must have been aware of it.

52.  The totality of the evidence presented does not support a finding that, prior

---

[17] Two other note holders sued the company.  Their claims were settled out of court.

15

to July 23, 2010, any defendant failed to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.

53.   Presently, SAE continues to operate as an ongoing concern.  The reserve sale of the KXP properties was consummated in November 2010, netting the company $6,900,000.  In addition, the company sold its Woolsey properties in July 2011 for nearly $30 million, of which SAE received more than $19 million.

54.   SAE has continued to make all payments due on the restructured notes and has cash available to meet its interest obligations.  It continues to operate without new investor funds.

## II.  CONCLUSIONS OF LAW

The motion presently before me renews defendants' mid-trial request for relief under Rule 52(c), which provides, in relevant part, that

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of evidence.

FED. R. CIV. P. 52(c).  In considering a Rule 52(c) motion, the court is not limited in its evaluation of the nonmovant's case, as it would be on a motion for judgment as a matter of law.  *See* Charles A. Wright & Arthur Miller, 9C *Federal Practice & Procedure Civil* § 2573.1 (3rd ed. 2008); *Oklahoma v. Tyson Foods, Inc.*, 2010 WL 653032 at *2 (N.D. Okla. Feb. 17, 2010).  Rather, the court may weigh the evidence, resolve disputed issues of fact, "and decide for itself in which party's favor the preponderance of the

evidence lies."  9C Federal Practice & Procedure Civil § 2573.  ***See also Roth v.***

***American Hospital Supply Corp***., 965 F.2d 862, 865 & n.2 (10th Cir. 1992) (applying

former Rule 41(b), the precursor to Rule 52(c)).  "In so doing, the court is not required to

consider the evidence in the light most favorable to the plaintiff, but may weigh the

evidence to determine whether or not the plaintiff has demonstrated a factual and legal

right to relief."  ***Tyson Foods, Inc.***, 2010 WL 653032 at *2.

The SEC has brought claims under section 17(a)(2) of the Securities Act and

Rule 10b-5(b) against defendants for fraud, and under sections 17(a)(1) and (a)(3) of

the Securities Act and Rule 10b-5(a) and (c) for "scheme liability".  I examine the issues

implicated by these provisions in turn.

## A.  FRAUD

55.  Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or any facility of any national
> securities exchange –
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or
> sale of any security registered on a national securities
> exchange . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as
> the Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (West Supp. 2004).  Rule 10b-5(b), promulgated under the authority

of this section, renders it a violation of section 10(b) "[t]o make any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the

statement made, in the light of the circumstances under which they were made, not

17

misleading." 17 C.F.R. § 240.10b-5.

56.  To state a cause of action under these provisions, the SEC must prove by a preponderance of the evidence that a particular defendant made "(1) a misrepresentation or omission (2) of material fact,[18] (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means."[19]  ***SEC v. Wolfson***, 539 F.3d 1249, 1256 (10th Cir. 2008) (citation omitted). The state of mind required to state a cause of action under Rule 10b-5(b) is scienter, that is, an "intent to deceive, manipulate, or defraud." ***Ernst & Ernst v. Hochfelder***, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).  Scienter can be proven by showing either knowing or intentional misconduct or recklessness, that is, "'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" ***City of Philadelphia v. Fleming Companies, Inc.***, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting ***Anixter v. Home-Stake Production Co.***, 77 F.3d 1215, 1232 (10th Cir. 1996)).

57.  Likewise, section 17(a)(2) of the Securities Act makes it unlawful for any person  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements

---

[18]  A fact is material if there is a substantial likelihood that a reasonable investor would consider that information important in making an investment decision. ***TSC Industires, Inc. v. Northway, Inc.***, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

[19]  The jurisdictional means requirement is satisfied by the use of the means and instrumentalities of interstate commerce, including the mails, telephone, or internet in connection with the fraud. 15 U.S.C. §§ 77q(a) & 78j(b); 17 C.F.R. § 240.10b-5. ***See also SEC v. Solucorp Industries, Ltd.***, 274 F.Supp.2d 379, 419 (S.D.N.Y. 2003).  This elements appears uncontested.

made, in light of the circumstances under which they were made, not misleading. 15 U.S.C. § 77q(a)(2).  The state of mind necessary to prove a claim under section 17(a)(2) is negligence.  *Aaron v. SEC*, 446 U.S. 680, 701-02, 100 S.Ct. 1945, 1958, 64 L.Ed.2d 611 (1980).  A defendant acts negligently in stating or omitting a material fact if he "fail[s] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation."  *SEC v. True North Finance Corp.*, – F.Supp.2d –, 2012 WL 5471063 at *42 (D. Minn. Nov. 9, 2012).

58.   The SEC has framed its claims as involving two primary misrepresentations – that investor funds would be used to advance the company's operations (specifically drilling and property acquisition) and that payments to investors would be funded by the operations of the company (primarily from asset sales) – and two primary omissions – that investor funds were used to pay off existing debt and that the company had insufficient funds to pay ongoing expenses without raising new capital from promissory notes.

59.  I perceive nothing in the copious evidence in this case to suggest that any defendant actually made affirmative misrepresentations to investors of the nature claimed by the SEC.  There was little actual evidence of what was said at a December 2008 meeting of investors in Albuquerque, New Mexico.  Certainly, no one who testified regarding that meeting could provide anything more than broad generalizations about the types of matters that were discussed.  Moreover, although all three note holders who testified at trial stated that it was their understanding and belief that their investments would be used to fund operations, all eventually acknowledged that they

were never actually told as much by anyone associated with SAE.[20]

60.   Instead, the evidence demonstrated that, to the extent any accredited investor actually inquired about the use of investor funds, they were told plainly about SAE's policy of "bridging the gap" by relying on monies from new notes to service debt attributable to existing ones.  In addition, the Subscription Agreement plainly stated that investor funds could be used for any purpose at the discretion of the company.[21]  All three witnesses acknowledged that servicing existing debt was a legitimate business purpose, thus coming within the boundaries of the matters disclosed by the Subscription Agreement.

61.   Nor do I find compelling the SEC's argument that Mr. Etkind committed fraud by assuring investors that SAE was not a Ponzi scheme.  A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."  *In re M & L Business Machine Co., Inc*.  84 F.3d 1330, 1332 n.1 (10th Cir.), *cert. denied*, 117 S.Ct. 608 (1996) .  *See also United States v. Godwin*, 272 F.3d 659, 666 n.3 (4th Cir. 2001) (Ponzi scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors"), *cert. denied*, 122 S.Ct. 1942 (2002).  A Ponzi scheme exists where it is

---

[20]  Mr. Conley came close to so stating, but could not recall any particulars of the alleged conversation that purportedly formed the basis of his understanding.  I do not find his testimony in this regard credible, given the language of the Subscription Agreement, the contrary and credible testimony of Mr. Etkind and Ms. Hattig, and Mr. Conley's status as one of the two investors who did not agree to the restructure and his concomitant obvious antipathy to defendants.

[21]  As discussed more fully *infra*, I reject the SEC's argument that the Subscription Agreement itself was misleading for failing to specifically delineate service of the debt among the list of possible uses of investor funds.

shown that "(1) deposits were made by investors, (2) [defendant] conducted little or no legitimate business operations as represented to investors, (3) [defendant's] purported business operation produced little or no profits or earnings, and (4) source of payments to investors was cash infused by new investors." *In re Whitley*, 2012 WL 170135 at *4 (Bkrtcy. M.D.N.C. Jan. 19, 2012).

62.  The evidence fails to establish that SAE conducted "little or no legitimate business operations" or that it "produced little or no profits or earnings."  The evidence was more than sufficient to demonstrate that SAE and its affiliates had real assets that had actual value and that SAE conducted significant, legitimate business operations. Mr. Palmer explained in detail the historical information and other data that informed his oil and gas models in this regard, and I find his testimony coherent and credible.  Ms. Wells testified extensively about the types of information that informed her estimations of the value of the company's geothermal assets, including, most significantly, the independent verifications of respected third party consultants.

63.  The SEC attempted to undermine the reliability of SAE's internal information through the rebuttal testimony of Ms. O'Connor.  I do not find her testimony sufficiently compelling to undermine defendants' confidence in their own internal estimations of the value of the company's assets.  Ms. O'Connor admitted on cross-examination that she did not know how the success ratios for drilled wells were derived, whether they applied to all Murfin's wells in Kansas or just those in which SAE participated, or whether they applied to wells drilled with the assistance of 3D seismic.  In fact, and only by way of example, Mr. Palmer relied on a fifty per cent (50%) success rate for wells drilled with 3D seismic, much less than the seventy per cent (70%) success ratio found for

21

commercial operations in Kansas generally.  Moreover, Ms. O'Connor considered no historical data prior to 2008 to give context to Mr. Palmer's assumptions.  Nor did she place any value on SAE's intangible rights or unproven or undeveloped leaseholds. There was no evidence offered to suggest that SAE's consideration of the value of such unproven assets – of which Woolsey was one – was unsound either in theory or practice.  In short, there was no credible evidence suggesting that SAE's models and internal projections were based on faulty assumptions, manufactured evidence, or otherwise not worthy of credence.[22]

64.  The gravamen of the SEC's fraud claims is its allegation that defendants were required affirmatively to disclose the nature of the company's financing model in order to make statements about the strength and viability of the company's financial situation not misleading.  The evidence of this alleged fraud-by-omission can be grouped into four broad categories:  (1) periodic activity update letters; (2) periodic letters to note holders; (3) email communications with investors; and (4) the Subscription Agreement.

65.  The securities laws "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc. v. Siracusano*, – U.S. –, 131 S.Ct. 1309, 1321, 179 L.Ed.2d 398 (2011).  The duty to disclose arises only "when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Id.* (citation and internal quotation marks omitted).  Thus

---

[22]  SAE's internally generated estimates of the value of its holdings (Tr. Exhs. 375, 376, 380, 389, and 394) were admitted at trial over the SEC's objection.  I now overrule that objection and consider these exhibits to the extent they bear on defendants' state of mind regarding the financial prospects and health of SAE during the relevant time period.

"companies can control what they have to disclose under these provisions by controlling what they say to the market." *Id.* at 1322.  ***See also In re Citigroup, Inc. Securities Litigation***, 330 F.Supp.2d 367, 377 (S.D.N.Y. 2004) (federal securities laws "do not require a company to accuse itself of wrongdoing"), ***aff'd***, 165 Fed. Appx. 928 (2nd Cir. Feb. 6, 2006).  "Moreover, revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." ***Richman v. Goldman Sachs Group, Inc.***, 868 F.Supp2d. 261, 274 (S.D.N.Y. 2012) (citations and internal quotation marks omitted).

66.  I find first that the Subscription Agreement was not misleading simply because it did not specifically enumerate debt service as a possible use of investor funds.  Even after this language was removed in 2007, the remaining disclosure is certainly broad enough to encompass these types of expenditures.  Moreover, as noted above, all three investors who testified at trial admitted that debt servicing was a legitimate business purpose and thus within the scope of the agreements.

67.  The activity update letters alleged to be misleading by omission were sent to investors in December 2007 (Tr. Exh. 5), October 2008 (Tr. Exh. 19), and February 2010 (Tr. Exh. 30).  At the conclusion of all three letters, the following relevant language appears:

> We expect that St Anselm, over the next year or two, will continue to fund activities in the Kansas/Nebraska program from private debt financing.  We believe the program has shown, and will continue to show, more than enough equity to support St. Anselm's debt.  *While we are confident that the overall economics of the Kansas/Nebraska program will prove to be sound and profitable (generate sufficient cash to service debt and provide a return on investment for the St. Anselm shareholders), any extended period of slow drilling,*

> *whether due to bad weather or other factors, could adversely*
> *impact future cash flow.  And, of course, a series of*
> *unsuccessful or less-successful-than-expected wells could*
> *increase the negative impact on future cash flow, even*
> *though subsequent wells could continue to show an overall*
> *50% or greater success rate in drilling wells with the*
> *anticipated reserves.  Our strategy of funding activities from*
> *private financing is not without risk, which is reflected in the*
> *interest rate offered to investors and the personal guaranty*
> *of repayment.*

(Emphasis in originals.)  Having thus addressed the issue, defendants were required to state all facts that bore on the issue of debt servicing.  I do not find, however, that SAE's actual economic position at the time of these update letters was so precarious as to make this disclosure materially misleading.

68.  I find the testimony of the SEC's proffered expert on this topic, Ms. Cook, to bear little weight in my analysis of this issue.  Ms. Cook was asked to cabin her review of the evidence to the time period between January 1, 2007, and September 30, 2010.  Thus, she did not consider two of SAE's largest asset sales (the February 2006 Hat Creek sale and the July 2011 Woolsey sale), which occurred outside this narrow window.  Moreover, Ms. Cook considered only cash infusions to the company.  She took no account of SAE's assets or the growth of assets unless and until they had been monetized.  In other words, she gave no consideration to the potential value – however well supported – of non-liquid assets. Even under Ms. Cook's limited assessment, she acknowledged that SAE had sufficient income from sources other than notes to pay both interest and principal on the company's debt in 2008, and adequate income in 2007 and 2009 to pay interest.

69.  I find much more credible the testimony of defendants' rebuttal expert,

24

Steven Shuster, that, when considered over a broader period representing the more typical business cycle in the industry, SAE had adequate revenue apart from income from promissory notes to pay its debt – both principal and interest – to note holders.[23] Ms. Cook herself conceded that over the entire period she considered (rather than on a year-by-year basis), only twenty per cent (20%) of the revenue attributable to the sale of promissory notes was used to service the debt.

70.   Given the facts as I find them from the evidence presented at trial, I find that none of the defendants acted negligently, much less with scienter, in connection with the representations made in any of the activity update letters.

71.   A third category of alleged misrepresentations by omission are comprised of letters addressed to "Dear St. Anselm Note Holder" and dated October 8, 2008 (Tr. Exh. 199), December 2008 (Tr. Exh. 20), March 2009 (Tr. Exh. 22), June 22, 2009 (Tr. Exh. 27), January 21, 2010 (Tr. Exh. 21), April 7, 2010 (Tr. Exh. 31), and June 14, 2010 (Tr. Exh. 32).  Nothing in the October or December 2008 letters addressed the issue of investor financing or debt service at all.[24]  Thus, no duty to speak on that topic arose from these communications.

72.   The letters from 2009 and 2010 informed investors of more attractive terms and additional incentives (in the form of bonus payments) for new and renewing notes. To extent the offer of such terms implicated a duty to reveal that defendants would use

---

[23] Mr. Shuster pointed out that SAE took in $61 million in revenue from sources other than promissory notes during the six-year period he considered, more than sufficient to service the $57 million in debt – both principal and interest – during that same period.

[24] The October letter did state that SAE's debt-to-equity ratio was 2-to-1, but nothing in the evidence demonstrated that this representation was false.

investor funds to service the company's debt, among other purposes, here again, I find nothing in the evidence that suggests either scienter or negligence in such an omission.

The alleged omission might be material if defendants did not reasonably believe or were reckless in believing that the company's assets did not have sufficient value to support the investment therein. Yet in 2009, SAE estimated that it would have wells and reserves by early 2010 in which KXP's interest would have a market of value of between $15 million and $18 million, an estimate that was supported by a reserve report from an independent third party. Moreover, the SEC has not shown that defendants' confidence in their ability to consummate the reserve sale and complete the sale of the St. Mary's geothermal properties to Ormat during the first half of 2010 was irrational or unreasonable. All the science indicated that these assets were highly valuable, and there was no evidence presented to suggest that defendants somehow should have divined the softening in relevant markets that appears to have been the major driver in their inability to complete these transactions as anticipated.

73. Finally, the SEC points to a vast number of email communications from 2008, 2009, and 2010, mostly from Mr. Etkind, soliciting investments or inquiring about renewals of existing notes. (***See, e.g.***, Tr. Exhs. 24, 34, 39, 42, 47, 60, 72, 73, 78, 79, 153, 156, 162, 209; ***see also*** Tr. Exh. 85 (2/14/2010 email from Mr. Zakaroff to investors Mark and Laurie Housel).) I have reviewed all of these communications and find nothing in them that would support a duty to inform investors of the practice of using investor funds to service the debt in light of the company's financial situation. Even if such a duty existed, I conclude that the evidence is not sufficient to support a conclusion that, prior to July 23, 2010, when defendants decided to restructure and

stopped soliciting notes, any defendant had intent to mislead or was reckless in communicating with investors without specifically revealing that investor funds were used to service the company's debt.

74.   The question of negligence in these communications is somewhat closer, but only concerning communications in July 2010.  Yet nothing in the evidence suggests that, prior to that time, defendants acted unreasonably in continuing to anticipate the closing of the KXP reserve sale and the St. Mary's transaction with Ormat.  When it became clear that these sales would be delayed, and consequently that the July 2010 interest payments could not be met, defendants immediately began planning to restructure.  Moreover, it was uncontroverted that SAE refunded in whole every investment made with the company after June 28, 2010.

75.   What this court perceives frpm the evidence presented in this case is not fraud, whether intentional or reckless, or even negligence, but a company that got too far out over its skis.  SAE's business model worked well for years, and there was nothing inherently suspect about relying on investor financing as one piece among several to service debt and operate a business.  Beginning in 2007, the confluence of several promising opportunities that seemed likely to yield enormous returns enticed the company to take on additional debt in order to acquire additional assets.  Yet with the economic downtown of 2008 and the sudden decline in the relevant markets, the company's historical ability to sell assets to fund operations was compromised.  No defendant is charged with clairvoyance in the prediction of such external events.  When defendants realized their business model no longer worked in the then-current economy, they moved with appropriate speed to revamp it and save investors' principal.

That strategy worked, as SAE is still operating today.

76.  For these reasons, I find and conclude that defendants' motion for judgment as a matter of law pursuant to Rule 52(c) should be granted as to the SEC's claims for fraud under section 17(a)(2) of the Securities Act and Rule 10b-5(b).

### B.  SCHEME LIABILITY

77.  The SEC also has brought claims under section 17(a)(1) and (3) and Rule 10b-5(a)( and (c) for scheme liability.  These statutes make it unlawful to engage, directly or indirectly, in a course of business or employ a device in furtherance of a scheme to defraud in connection with the sale or exchange of securities.  *SEC v. Zanford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002).

To prove a violation of Rule 10b-5(a) or 10b-5(c), the SEC must prove by a preponderance of the evidence that a defendant, acting with scienter, committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud.  *In re Qwest Communications International, Inc. Securities Litigation*, 387 F.Supp.2d 1130, 1143 (D. Colo. 2005).

Section 17(a)(1) prohibits the use of any device, scheme or artifice to defraud in the offer or sale of any securities by use, directly or indirectly, of the means of interstate commerce or the mails.  15 U.S.C. §§ 77q(a)(1).  To prove its claim under section 17(a)(1) of the Securities Act, the SEC must establish (1) the direct or indirect use of a device, scheme or artifice, to defraud; (2) with scienter; (3) in the offer or sale of a security; (4) using interstate commerce or the mail.  *SEC v. Coffman*, 2007 WL 2412808 at *10 (D. Colo. Aug. 21, 2007).

Section 17(a)(3) makes it unlawful to engage in any transaction, practice, or

course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. §§ 77q(a)(3). To prove a violation of this section, the SEC must demonstrate that defendants (1) engaged in acts, practices, or courses of dealing which operate as a fraud or deceit; (2) in the offer or sale of securities; (3) using interstate commerce or the mails; and (4) negligence. *Aaron*, 100 S.Ct. at 1958.

78. Scheme liability recognizes that "[c]onduct itself can be deceptive." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158, 128 S.Ct. 761, 769, 169 L.Ed.2d 627 (2008). Nevertheless, liability does not arise simply by virtue of repackaging a fraudulent misrepresentation a "scheme to defraud." *Public Pension Fund Group v. KV Pharmaceutical Co.*, 679 F.3d 972, 987 (8th Cir. 2012). Rather, scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance. *SEC v. Daifotis*, 2011 WL 2183314 at *9 (N.D. Cal. June 6, 2011), *modified on other grounds*, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011); *SEC v. Lucent Technologies, Inc.*, 610 F.Supp.2d 342, 360 (D.N.J. 2009). The conduct must be "inherently deceptive when performed." *SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011).

Stated differently, scheme liability exists only where there is deceptive conduct going beyond misrepresentations. *KV Pharmaceutical Co.*, 679 F.3d at 987; *Kelly*, 817 F.Supp.2d at 344. Allegations of a scheme based on the same misstatements that would form the basis of a misrepresentation claim under Rule 10b–5(b) and nothing more are not sufficient. *See KV Pharmaceutical Co.*, 679 F.3d at 987; *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir.

2011), *cert. denied*, 132 S.Ct. 2713 (2012); *Lentell v. Merrill Lynch & Co., Inc*., 396 F.3d 161, 177 (2nd Cir.), *cert. denied*, 126 S.Ct. 421 (2005); *Lucent Technologies, Inc*., 610 F.Supp.2d at 359.  *See also SEC v. Familant*, 2012 WL 6600339 at *9 (D.D.C. Dec. 19, 2012) (noting that courts have rejected scheme liability "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission. . . .  In other words, because only [defendant] ultimately 'made' the false statement, the executives who plotted to unleash the false statement could not violate Rule 10b-5."); *TCS Capital Management, LLC v. Apax Partners, L.P.*, 2008 WL 650385 at *22 (S.D.N.Y. Mar. 7, 2008) (rejecting Rule 10b–5(a) and (c) claims where alleged deception "arose from the failure to disclose the 'real terms' of the deal," which was "nothing more than a reiteration of the misrepresentations and omissions" of the disclosure claim).

79.  The SEC posits a number of ways in which it claims defendants engaged in a deceptive scheme.  (*See* SEC Br. At 117 n.16 [#144], filed August 31, 2012.)[25] However, I conclude that there is nothing inherently deceptive about any of these actions.  The only way in which they might be conceived to be deceptive is by virtue of the SEC's contention that they bolstered the allegedly false impression created by defendants' misrepresentations and omissions which form the basis of the 10b-5(b) and section 17(a)(1) claims.  However, the statute does not permit such legal "double

---

[25]  In its proposed conclusions of law, the SEC suggests that post-fraud "lulling letters" can be evidence of a scheme to defraud.  (*See* **SEC Proposed Findings of Fact and Conclusions of Law** at 101-103 [#144], filed August 31, 2012.)  The precedents on which it relies, however, all involve criminal prosecutions under the mail and wire fraud statutes.  The SEC presents no authority suggesting that these concepts have been or should be applicable to civil actions under the federal securities laws.  Moreover, to the extent lulling letters might be thought relevant, they still would have to arise with reference to an underlying scheme separate from the communications contained therein, which is not shown on the current record.

dipping."

80.  Accordingly, defendants' motion for judgment as a matter of law as to the SEC's scheme liability claims must be granted also.

### III.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendants' Motion for Judgment Pursuant to F.R.C.P.** 52(c) [#141], filed August 17, 2012, is **GRANTED**;

2.  That judgment with prejudice **SHALL ENTER** on behalf of defendants, St. Anselm Exploration Co.; Michael A. Zakroff; Mark S. Palmer; Anna M.R. Wells; and Steven S. Etkind, against plaintiff, the United States Securities and Exchange Commission, on all claims for relief and causes of action asserted in this action; and

3.  That defendants are **AWARDED** their costs to be taxed by the clerk of the court in the time and manner provided by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated March 29, 2013, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge